# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

v.

TERRY CUNNINGHAM,
CHERYL MCARTHUR,
NAJON CUNNINGHAM,
JOVAN CUNNINGHAM,
DIONTE BERNARD,
CIERRA MCARTHUR,
TAMARA MCARTHUR, and
ELBERT BROOKS

                Defendants.

Case No. 15-CR-83-JPS

ORDER

On November 3, 2015, a grand jury in this district returned an eleven-count superseding indictment against the defendants with charges including: (1) conspiring to possess, attempting to possess, and possessing heroin, with an intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (C), and 846; and (2) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 2. (Docket #83.)

In anticipation of the jury trial for this matter, which is currently set for July 11, 2016 (Docket #155), Defendant Terry Cunningham ("Mr. Cunningham") filed two pretrial evidentiary motions (Docket #63, #64). Specifically, Mr. Cunningham filed: (1) a motion to suppress evidence found pursuant to a search warrant executed in Mr. Cunningham's home in 2015

(Docket #64); and (2) a motion to suppress evidence found as a result of a traffic stop in 2013 (Docket #63).[1]

In addition, Tamara McArthur ("Ms. McArthur") filed a motion for the return of certain property. (Docket #109).[2]

On April 15, 2016, and April 19, 2016, Magistrate Judge William Duffin conducted evidentiary hearings to address the pendent motions. (Docket #133, #134). Based on the facts developed therein, Magistrate Duffin issued a Report and Recommendation in which he concludes that this Court should deny both of Mr. Cunningham's motions to suppress. (Docket #144). Magistrate Duffin did not rule on Ms. McArthur's motion for the return of property. (Docket #144).

Pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Federal Rule of Criminal Procedure 59(b)(2), Mr. Cunningham filed numerous objections to Magistrate Duffin's Report and Recommendation. (Docket #158). Those objections have now been fully briefed by the parties. (Docket #160, #161, #163). For the reasons stated herein, the Court will adopt Magistrate Duffin's recommendation that Mr. Cunningham's motions to suppress be denied (Docket #144) and will accordingly deny those motions in their entirety (Docket #63, #64). In addition, as explained more fully below, the Court will deny Ms. McArthur's motion for a return of property. (Docket #106).

---

[1] Mr. Cunningham's co defendant, Cheryl McArthur, also filed a motion to suppress the evidence seized as a result of the traffic stop. (Docket #65). However, Cheryl McArthur has since withdrawn her motion. (Docket #132).

[2] In addition, both Mr. Cunningham and his son, Jovan Cunningham, have filed motions to exclude informants from trial. (Docket #136, #145). The Court will address these matters at the final pretrial conference.

1. BACKGROUND

The government's investigation into the Cunningham family's involvement with drug trafficking began in 2011.[3] (Docket #64, Ex. 2 at 6). The government contends that drug trafficking is not strictly a family business, however, as the Cunninghams are allegedly involved in a broader criminal network led by Kevin Arms. (Docket #64, Ex. 2 at 6). That group is known to the government as the Kevin Arms Drug Trafficking Organization ("DTO"). (Docket #64, Ex. 2 at 6).

Mr. Cunningham's motions arise out of two separate incidents: a traffic stop in 2013 and a house search in 2015. (Docket #63, #64). The government, in part, relied on the evidence obtained during the 2013 traffic stop in order to obtain the 2015 search warrant of the Cunninghams' home. (Docket #64, Ex. 2 at 7-8). Because the government allegedly violated various aspects of the Fourth Amendment during the course of the traffic stop and house search, Mr. Cunningham asks that all evidence obtained as a result of these incidents be suppressed. (Docket #63, #64).

Prior to the traffic stop, and beginning in approximately 2011, confidential sources had informed law enforcement that the DTO trafficked cocaine and other illicit drugs from outside the State of Wisconsin. (Docket #64, Ex. 2 at 6; #74 at 1-2). The organization often relied on rented vehicles, known as "traps," to help cover the transport of the drugs. (Docket #74 at 2). At some time prior to the traffic stop in dispute, law enforcement learned

---

[3] Terry Cunningham is married to Cheryl McArthur; Jovan Cunningham and Najon Cunningham are their sons. (Docket #64, Ex. 2 at 6). In addition, Tamara McArthur and Cierra McArthur are the daughters of Cheryl McArthur. (Docket #64, Ex. 2 at 6). As far as the Court is aware, Dionte Bernard and Elbert Brooks have no blood relation to their co-defendants.

that Kevin Arms' newest cocaine source was Timothy Cunningham, Mr. Cunningham's brother, who operated out of Florida. (Docket #74 at 2).

On July 25, 2013, a confidential informant reported that Jovan Cunningham ("Jovan"), Mr. Cunningham's son, was traveling in a rented vehicle to Atlanta, Georgia. (Docket #74 at 2). He was allegedly traveling with other known heroin distributors, Antoine Woodland and Anthony Woodland. (Docket #74 at 102). A court order authorized law enforcement to track Jovan's mobile phone, which confirmed Jovan's presence in Douglasville, Georgia—approximately twenty (20) miles outside of Atlanta. (Docket #74 at 2). Court-authorized cellsite and GPS data also revealed that Kevin Arms was in Atlanta at this time. (Docket #74 at 2). As a part of the government's surveillance, the Drug Enforcement Administration ("DEA") confirmed that three rental cars located at the hotel in which Jovan was staying were rented under the name, "Cunningham." (Docket #74 at 3).

On July 28, 2013, a GPS tracking device on Jovan's mobile phone showed that it was traveling north from Georgia toward Wisconsin. As a result, law enforcement officers from several law enforcement departments set up an "interdiction operation" on Interstate 94 in Racine County, Wisconsin. (Docket #74 at 3). On July 29, 2013, at approximately 2:10 a.m. DEA Special Agent James Krueger ("Agent Krueger") observed three vehicles—the cars that were rented under the Cunninghams' name—traveling closely behind one another. (Docket #64, Ex. 2 at 7; #74 at 3). Agent Krueger also saw the vehicle traveling in front, a Suburban, pay the toll for the other two vehicles, giving him reason to believe that all three vehicles were traveling together. (Docket #74 at 4). By following the vehicles, Agent Krueger determined that they were traveling about ten miles-per-hour over the speed limit. (Docket #74 at 4; Docket #161 at 25-26). He reported to

Case 2:15-cr-00083-JPS    Filed 06/07/16    Page 4 of 28    Document 167

surveillance units located in southern Wisconsin that the three rental vehicles were approaching Wisconsin and that they were speeding. (Docket #161 at 26).

At 2:26 a.m. officers first stopped the Acadia, the vehicle in back, in Racine County for speeding. (Docket #161 at 27). Jovan Cunningham was in the Acadia. (Docket #74 at 4). A short time later, other officers pulled over the Sorento, the middle vehicle, approximately one mile north of where the Acadia was stopped. (Docket #74 at 4). Najon Cunningham, Cierra McArthur, and Dionte Bernard were the occupants of the Sorento. (Docket #74 at 4). Officers Brett Huston ("Officer Huston") and Eric Donaldson ("Officer Donaldson") of the Milwaukee Police Department then stopped the Suburban approximately five miles north of the location where the Sorento was pulled over. (Docket #161 at 32-33). Officer Huston testified that the Suburban was traveling in excess of ten to fifteen miles-per-hour over the speed limit. (Docket #161 at 107-08). Mr. Cunningham, Cheryl McArthur, Tamara McArthur, and another passenger were in the Suburban. (Docket #74 at 4). After stopping the Suburban, Officer Huston approached the vehicle to gather information from the occupants, including the driver's license and vehicle's registration. (Docket #161 at 108-09). He then returned to his vehicle to write down the information and to call in wanted checks of all the occupants. (Docket #161 at 108-09).

Detective Eugene Nagler ("Detective Nagler") of the Milwaukee Police Department, along with his narcotics detection dog, Duke, were in a patrol car participating in the interdiction operation. (Docket #74 at 4). Officer Huston testified that, before he had an opportunity to write down the occupants' names and complete their wanted checks, Detective Nagler arrived on the scene. (Docket #161 at 109). Detective Nagler testified that he

Case 2:15-cr-00083-JPS    Filed 06/07/16    Page 5 of 28    Document 167

and Duke arrived on the scene about five to ten minutes after the Suburban was stopped. (Docket #162 at 149, 153-54). Although Agent Krueger's report from that evening originally stated that Detective Nagler arrived at 3:39 a.m.—over an hour after the Suburban was stopped—he testified at the evidentiary hearing that the 3:39 a.m. note had been written in error; rather, Detective Nagler arrived on the scene at 2:39 a.m. (Docket #161 at 78-79).

After arriving on the scene, Detective Nagler testified that he spoke with officers on scene for about five to ten minutes before retrieving Duke to sniff around the Suburban for the presence of drugs. (Docket #162 at 149, 153-54). Shortly after beginning the dog sniff, Duke alerted to the presence of controlled substances. (Docket #162 at 149). Officers on the scene then searched the vehicle for contraband. (Docket #161 at 110). During the search, officers opened a bag and found $8,000.00 in cash, various pieces of diamond jewelry, two small bags of marijuana, and several pills. (Docket #161 at 34-36, 110). The officers also searched a wallet and found cards in Terry Cunningham's name and a Wisconsin QUEST card. (Docket #161 at 34-36, 110). In a suitcase, the officers seized a Coffee-mate canister with removable bottom—sometimes known as a "California Safe"—paper towels, a bottle of Dormin containing pills, and Coffee-mate powder. (Docket #161 at 34-36, 110). Two days later, the police opened a paper towel found in the canister and found a small bag of heroin. (Docket #161 at 39).

Approximately two years later, Agent Krueger submitted an affidavit to Magistrate Judge Nancy Joseph in support of a warrant to search three residences, including a home at 3030 N. 38th Street in Milwaukee, Wisconsin. (Docket #42, Ex. 2). Mr. Cunningham allegedly shared that home with his wife, Cheryl McArthur. Based on that affidavit, Magistrate Joseph signed a search and seizure warrant. (Docket #64, Ex. 1). Federal law enforcement

executed the warrant obtained in reliance on Agent Krueger's affidavit on March 5, 2015. (Docket #73 at 3). The warrant permitted the officers to seize, among other things, items related to food stamp fraud and wire fraud. (Docket #64, Ex. 1 at 4-5). The warrant also authorized the seizure of computers and cell phones used to commit those offenses, as well as evidence of ownership and occupancy of the residence and of the electronic devices. (Docket #64, Ex. 1 at 5-6). Mr. Cunningham seeks to exclude all the evidence seized as a result of the March 5, 2015 search of his home. (Docket #64).

2.    LEGAL STANDARD

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may consider potentially dispositive motions, such as a motion to suppress evidence, and issue proposed recommendations to the district judge regarding the motion. When reviewing a magistrate's recommendation, the Court is obliged to analyze the portions of the report to which the defendant has lodged objections *de novo*. 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* In other words, the Court's *de novo* review of Magistrate Duffin's findings and recommendation is not limited to his legal analysis alone; rather, the Court may also review his factual findings and accept, reject, or modify those findings as it sees fit based upon the evidence. *Id.*

The Court will address each pending motion in turn.

3.    THE TRAFFIC STOP

Mr. Cunningham originally raised four issues in his motion to suppress: (1) whether the officers who conducted the traffic stop had probable cause to stop the Suburban for speeding; (2) whether the occupants

of the Suburban were unlawfully detained after the purpose of the traffic stop was completed; (3) whether the officers had probable cause to search the Suburban; and (4) whether the officers had probable cause to seize the items collected from the Suburban. *(See generally* Docket #63). Following the development of the facts at the evidentiary hearing, Mr. Cunningham conceded there was probable cause for the stop based on the officers' observation that the Suburban was speeding. (Docket #158 at 2). However, Mr. Cunningham now adds a new argument: that the officers involved in the stop did not have authority to enforce the traffic laws in Racine, Wisconsin. (Docket #158 at 2).

### 3.1 Detention of the Suburban

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. CONST. amend IV. "An officer's temporary detention of an individual during a traffic stop constitutes a seizure of a person and thus must be reasonable under the circumstances." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) (internal citations omitted). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011) ("[T]he prosecution bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause."). "When a police officer reasonably believes that a driver has committed even a minor traffic offense, probable cause supports the stop." *Id.*

"[T]he use of a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests." *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). However, "[a] stop justified solely by the need to

investigate a traffic violation can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *United States v. Cooks*, 168 F. App'x 93, 96 (7th Cir. 2006) (citing *Caballes*, 543 U.S. at 408); *accord Martin*, 422 F.3d at 602. "[I]nformation lawfully obtained while investigating the traffic offense may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *Id.* (citing *Martin*, 422 F.3d at 602) (internal quotation marks omitted). Pretextual traffic stops are permitted under the Fourth Amendment "so as long as they are based on an observed violation of a traffic law." *Huff*, 744 F.3d at 1004 (citing *Whren*, 517 U.S. at 810).

Here, Mr. Cunningham concedes that Officers Huston and Donaldson had probable cause to conduct a traffic stop of the Suburban based on their perception that the vehicle was speeding. (Docket #158 at 2). However, Mr. Cunningham maintains that his detention was unlawfully prolonged because the officers "immediately" abandoned their mission to complete a traffic stop once the Suburban pulled over. (Docket #158 at 2-6). Moreover, he argues that the government did not have reasonable suspicion to detain the Suburban's occupants for the investigation of other crimes. (Docket #158 at 6-8).

Mr. Cunningham's prolonged detention argument relies on the teachings of the Supreme Court's recent decision in *Rodriguez v. United States*, —U.S.—, 135 S.Ct. 1609, 1612 (2015). (Docket #63, #158, #163). In *Rodriguez*, the Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* Put another way, police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. *Id.* at 1615. Mr. Cunningham argues that, in essence, the

Court should reject Magistrate Duffin's determination that the officers who conducted the traffic stop in question were performing "ordinary inquiries" incident to the traffic stop at the time in which the dog sniff of the Suburban began. (Docket #158 at 4).

The Court rejects Mr. Cunningham's argument for both legal and factual reasons. First, Mr. Cunningham's position under *Rodriguez* puts the proverbial cart before the horse. Despite the government's repeated assertion that *Rodriguez* does not control the instant analysis (Docket #74, #160), Mr. Cunningham continues to ignore the fact that *Rodriguez* was decided in 2015—nearly two years *after* the traffic stop in question occurred. *Compare Rodriguez*, 135 S.Ct. at 1609 *with* Docket #74 at 3. Despite this, Mr. Cunningham provides the Court with no basis from which to conclude that *Rodriguez* should apply retroactively to the traffic stop. (Docket #63, #158). Though Magistrate Duffin did not expressly note this in his report, this Court cannot, absent any argument and/or showing that *Rodriguez* is retroactive under the *Teague* framework, apply the teachings of *Rodriguez* to the facts of this case. *See Davis v. United States*, 131 S.Ct. 2419, 2423-24 (2011) ("Searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."); *see also United States v. Williams-Davis*, No. 2:14-CR-04072-SRB-1, 2016 WL 308751, at *3 (W.D. Mo. Jan. 20, 2016), *on reconsideration*, No. 2:14-CR-04072-SRB-1, 2015 WL 6942499 (W.D. Mo. Nov. 10, 2015)(W.D. Mo. Nov. 10, 2015) (concluding that *Rodriguez* did not apply with respect to a traffic stop that occurred in 2014); *State v. Manning*, 50,591 (La. App. 2 Cir. 5/18/16) (same).

Nonetheless, according to *Caballes*, "[a] seizure…justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is

prolonged beyond the time reasonably required to complete that mission."
453 U.S. at 407. Beyond determining whether to issue a traffic ticket, an
officer's mission includes "ordinary inquiries incident to [the traffic] stop."
*Id.* at 408. Such "ordinary inquires" frequently include checking the driver's
license, determining whether there are outstanding warrants against the
driver, and inspecting the automobile's registration and proof of insurance.
*See Delaware v. Prouse*, 440 U.S. 648, 658–60 (1979). "Furthermore, even if an
officer mistakenly believes that a crime may have been committed, the officer
does not, by extending a stop, violate clearly established law so long as the
officer had reasonable grounds for prolonging the stop to investigate."
*Buchanan v. Kelly*, 592 F. App'x 503, 506 (7th Cir. 2014).

Here, Magistrate Duffin rejected Mr. Cunningham's contention that
the approximately twenty minutes that passed between the initial stop of the
Suburban and the deployment of Duke ran afoul of *Caballes*. In so doing, the
magistrate credited Officer Huston's testimony when he stated that, during
the time between the initial stop and the arrival of the narcotics detention
dog, Officer Huston was actively writing down the Suburban's occupants
names and conducting wanted checks on the vehicles' occupants. (Docket
#144 at 6-9).

Though the parties dispute whether the stop in question lasted
beyond twenty minutes, the Court finds this factual dispute immaterial.
Contrary to Mr. Cunningham's arguments, there is no *per se* durational limit
on the time "reasonably required to complete" a traffic stop. *See e.g.*,
*Buchanan v. Kelly*, 592 F. App'x 503, 506 (7th Cir. 2014) (finding that a
potentially thirty minute traffic stop justified under *Caballes*); *United States v.
Cooks*, 168 F. App'x 93, 96 (7th Cir. 2006) (finding an eight minute stop
justified under *Caballes*). Rather, "[t]he part of the traffic stop that matters for

the *Caballes* inquiry is the time leading up to the dog alert.…" *United States v. Garrett*, 139 F. App'x 720, 723 (7th Cir. 2005). Thus, even accepting Mr. Cunningham's position that it took twenty-one or twenty-two minutes for Duke to deploy, the Court concludes that traffic stop was not unlawfully prolonged because Officer Huston testified that he had not completed ministerial tasks attendant to the traffic stop during the relevant time period. (Docket #161 at 108-09).

Moreover, while Agent Krueger testified that "no officer took any action relating to speeding," Agent Krueger was not the officer who had conducted the stop in the first instance. (Docket #161 at 32-33, 73). Rather, Agent Krueger was the overall leader of the indiction effort and testified that he had not left his car at the time of the initial stop. (Docket #161 at 32-33) ("I was trusting those individuals to do the traffic stop."). Contrary to Mr. Cunningham's argument that the traffic stop had been "abandoned" by the officers, the testimony of Officer Huston revealed that tasks associated with the traffic stop began immediately after the cars pulled over on Interstate 94 and had continued through the time of Duke's deployment. (Docket #161 at 108-09). Therefore, the magistrate's decision to credit and rely on Officer Huston's testimony was both reasonable and supported by the evidence. This Court likewise concludes, on the basis of Officer Huston's testimony, that the traffic stop was not unreasonably prolonged because Officer Huston was actively conducting the "ordinary inquiries" of the traffic stop from the time of the stop until Duke arrived, sniffed, and alerted at the vehicle.

As noted by Magistrate Duffin, the fact that the officers were also investigating illicit drug dealing, or that they ultimately did not issue a speeding citation to Mr. Cunningham, does not render their seizure of the Suburban and its occupants unconstitutional. *See Carmichael v. Vill. of Palatine,*

*Ill.*, 605 F.3d 451, 457 (7th Cir. 2010) ("[S]ubjective motivations of the officer do not invalidate a search otherwise supported by probable cause."). Contrary to Mr. Cunningham's position, to the extent there was any delay between the time of the stop and the dog sniff at issue, such detention was supported by reasonable suspicion of drug trafficking.

"An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal citations omitted). "The officers initiating the investigatory stop must be able to point to 'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "[I]n determining whether officers had the requisite particularized suspicion for a *Terry* stop, we do not consider in isolation each variable of the equation that may add up to reasonable suspicion. Instead, we consider the sum of all of the information known to officers at the time of the stop." *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir.2014).

Here, multiple informants had linked members of the Cunningham family to the DTO, which had a history of transporting illicit drugs across state lines in rental vehicles such as those that were being driven by the Cunninghams. (Docket #74 at 1-2). According to these informants, the DTO's trafficking efforts were often multi-vehicle operations, which allowed leadership to monitor the transportation of product. (Docket #74 at 1-2). Here, the officers knew, based on GPS and cellsite data, that Jovan and Kevin Arms had both been out-of-state, in the Atlanta area, during the same time period immediately prior to the traffic stop. (Docket #74 at 1-2). Agent Krueger testified that he did not know which occupants were in which

vehicles until all three of the vehicles had been stopped. (Docket #161 at 100). Therefore, even if Kevin Arms had not been among the cars' occupants, it was certainly reasonable that he, Jovan, and/or the other occupants of the rental cars had coordinated a transportation of drugs. This is particularly so given the informants' statements that the Woodlands and Jovan had previously coordinated sales of heroin. The Court concludes that, on the basis of the information known to law enforcement at the time of the stop, even if the Suburban had not been speeding—which Mr. Cunningham concedes—the stop was properly supported by reasonable suspicion of drug trafficking.

### 3.2 Probable Cause to Search

Mr. Cunningham also argues that the government did not have probable cause to search the Suburban because: (1) the testimony received during the evidentiary hearing failed to demonstrate that Duke properly alerted to the presence of narcotics; and (2) the government failed to establish Duke's reliability in detecting narcotics. (Docket #158 at 10-11). Both of Mr. Cunningham's arguments are without merit.

First, with regard to Duke's alert, Mr. Cunningham argues that Agent Krueger "described Duke showing some sniffing interest but did not see the dog scratch in the manner that the dog would if it alerted." (Docket #158 at 10-11). The transcript pages to which Mr. Cunningham cites, however, merely state that Agent Krueger "saw the dog stick his nose in the back of the vehicle, but I don't remember if that's a—if that's a hit or what. I'm not sure what it was." (Docket #161 at 82). This lack of certainty demonstrated by Agent Krueger was clarified when he explained that he does not "know how to read a dog, sir. I'm not a K-9 handler." (Docket #161 at 81). On the other hand, as noted by the magistrate, Detective Nagler—Duke's handler

and the person trained to recognize Duke's alert—testified that Duke alerted to the back of the vehicle. (Docket #162 at 177). Thus, Magistrate Duffin's conclusion that Detective Nagler properly sighted and responded to a narcotics alert from Duke at the rear of the Suburban is supported by the testimony.

> With regard to Duke's reliability, according to the Supreme Court,
>
>> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a *bona fide* organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013)

Here, the government presented testimony that Duke was a properly trained narcotic detection dog who was re-certified yearly. (Docket #162 at 144-48; 158-62). Specifically, the government presented evidence that Duke was awarded training certificates from two organizations, including the North American Police Work Dog Association ("NAPWDA") and Lab Works 57. (Docket #162 at 144-48; 158-62). While training with the NAPWDA, Duke was exposed to multiple controlled experiments. (Docket #143) (explaining that Duke was "proofed" off "odors such as food, plastic bags, dryer sheets, cat food. Just a lot of the distractors out there to make sure that the dog is not alerting to those odors."); *see also United States v. Rhee*, No. 3:12CR2, 2014 WL 2213079, at *3 (N.D. Ohio May 28, 2014) (concluding that the NAPWDA was a "*bona fide*" organization). And, when certified through Lab Works 57, Duke was judged according to the standards set forth by the Customs and Border

Patrol. (Docket #162 at 162). Beyond these programs, Detective Nagler also testified that Duke had been trained and tested as a narcotics detection canine daily. (Docket #162 at 143-44, 163, 166-67). Detective Nagler noted no training errors by Duke and testified regarding Duke's history of high success in the field. (Docket #162 at 143-67).

Based on this evidence, the Court agrees with the magistrate that the government has satisfied its burden to establish probable cause and the reliability of Duke. Though Mr. Cunningham argues that Duke's NAPWDA certification is "stale" because it is over nine years old, the Court finds no reason to believe that the NAPWDA is not a *bona fide* organization based on its method of training and testing protocols. Moreover, Duke has been subsequently subject to evaluation by Lab Works 57. Mr. Cunningham's argument with regard to whether Lab Works 57 is a *bona fide* organization directs the Court to no guiding Supreme Court or Seventh Circuit precedent defining that term. But, even if the Court were to conclude that Lab Works 57 is not a *bona fide* organization—a conclusion that it does not (nor need to) make—the Court concludes that Detective Nagler's testimony regarding Lab Works 57's training standards and methods demonstrates Duke's "recent[] and successful[] complet[ion] [of] a training program that evaluated his proficiency in locating drugs." *Florida*, 133 S. Ct. at 1057. These two certifications, in addition to the field training and testing to which Detective Nagler testified, satisfy the Court that the government has met its burden to establish Duke's reliability. Thus, Duke's alert at the site of the Suburban's traffic stop supplied the government with sufficient probable cause to search the vehicle. *See Garrett*, 139 F. App'x at 723 ("As soon as a dog alerts during a traffic stop and provides the officers with probable cause to believe that a

car contains drugs, the officers have a new justification to extend a traffic stop.").

### 3.3 Probable Cause To Seize

Next, Mr. Cunningham argues that the officers' seizure of a Coffeemate cannister (a California safe with a removable bottom containing Dormin), a diamond necklace, and $8,000.00 in cash was unlawful. (Docket #158 at 11-14). The government justifies its seizure of these items based on the plain view doctrine. (Docket #160 at 6). Magistrate Duffin agreed with the government's argument and concluded that the seizure of the items was proper. (Docket #144 at 10-11).

"A warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was immediately apparent.'" *United States v. Schmidt*, 700 F.3d 934, 938-39 (7th Cir. 2012) (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)). Assuming the officers' traffic stop and subsequent detention of the Suburban were lawful, Mr. Cunningham appears to concede the first two elements of the plain view doctrine. Instead, he disputes the third requirement of the test: namely, that the "incriminating nature" of the items seized in this case were not "immediately apparent." (Docket #158 at 11-14).

"The 'immediately apparent' requirement does not mean that the criminal nature of the items seized must be apparent at first glance; rather it requires that the agents had 'probable cause to associate the property with criminal activity.'" *United States v. Rivera*, 825 F.2d 152, 157 (7th Cir. 1987) (citing *Texas v. Brown*, 460 U.S. 730, 741-42 (1983)). Moreover, "officers may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light." *Cellitti*, 387 F.3d at

624; *see also United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994) (concluding that the plain view doctrine justified the seizure of a large amount of cash found on a man who the police had reason to believe received it as a result of dealing illegal drugs). "As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' *Carroll v. United States*, 267 U.S. 132, 162 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas*, 460 U.S. at 742. "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Here, Agent Krueger testified that numerous confidential informants had linked members of the Cunningham family to drug trafficking and DTO. (Docket #161 at 13-18). Moreover, Agent Krueger testified he was aware that Mr. Cunningham himself had been prosecuted in the past with drug trafficking offenses and was on supervised release for that reason. (Docket #161 at 36). Following the traffic stop, and prior to the seizure of the objects in dispute, Duke had alerted to presence of drugs. (Docket #161 at 110). This alert was fruitful, as the officers recovered contraband in the vehicle in the form of marijuana. (Docket #161 at 34). Moreover, the officers recovered a cannister with a removable bottom, an object commonly known as a "California safe." (Docket #161 at 34). That cannister contained Dormin, which, according to Agent Krueger, is a common cutting agent for heroine. (Docket #161 at 34). The incriminating nature of these items was further intensified when the officers recovered Mr. Cunningham's QUEST card—a card that signaled that Mr. Cunningham was receiving food stamps from the

state government,[4] a large amount of cash ($8,000.00 in total), and what appeared to be a diamond necklace.  (Docket #161 at 34-36).

Based on circumstances known by the officers at the scene of the Suburban, the Court concludes the government properly seized the cannister, cash, and jewelry under the plain view doctrine. Based on the Cunninghams' history of drug trafficking and the confidential informants' statements that members of the Cunningham family were continuing to traffic illegal drugs, the government had probable cause to believe that the cannister/California safe and Dormin were being used in a secretive manner in order to transport and/or distribute illicit drugs. Moreover, these circumstances, in combination with the government's discovery of the QUEST card, provided the officers with probable cause to believe  the $8,000.00 in cash and jewelry were fruits of illicit drug dealing and/or evidence of criminal fraud. In sum, the Court agrees with Magistrate Duffin that the seizure of the cannister, jewelry, and cash were justified under the plain view doctrine because the officers had probable cause to believe that all of these items were associated with criminal activity.

---

[4]Mr. Cunningham argues, in his objections, that the government did not have authority to search Mr. Cunningham's wallet. (Docket #158 at 13). He did not, however, argue this position in his original motion. (Docket #63). As Mr. Cunningham has not presented this argument with any presentation of good cause as to why the position has not been previously advanced, *see* FED. R. CRIM. PRO. 12(c), the Court will consider the argument forfeited. *See United States v. Kelly*, 772 F.3d 1072, 1079 (7th Cir. 2014) ("Waiver occurs through an intentional relinquishment of an argument, while forfeiture is characterized by a neglectful failure to pursue an argument." (internal quotation marks omitted) (internal citations omitted)).

### 3.4 Authority to Conduct the Stop

Finally, Mr. Cunningham argues that the traffic stop of the Suburban violated the Fourth Amendment because the officers involved did not have authority to make a traffic stop in Racine County. (Docket #158 at 8-9). Magistrate Duffin rejected this position based on his conclusion that: (1) Mr. Cunningham had waived the argument by failing to raise it in his initial motion; and (2) suppression does not follow from a finding of a lack of jurisdiction. (Docket #144 at 5-6). Mr. Cunningham objects to both of these conclusions. (Docket #158 at 8-9). First, citing to Federal Rule of Criminal Procedure 12, Mr. Cunningham argues that he has not waived his argument because he did not have access to the facts underlying the objection prior to the evidentiary hearing. (Docket #158 at 8-9). Second, Mr. Cunningham argues that Seventh Circuit case law does not support Magistrate Duffin's jurisdictional holding. (Docket #158 at 8-9)

The Court concludes that, even if Mr. Cunningham had not waived his argument and suppression were proper under the circumstances, Officer Huston and Officer Donaldson—the team members who conducted the traffic stop of the Suburban—had authority to make the stop in question. Pursuant to Wis. Stat. § 175.40(6)(a)(6)(a)—sometimes known as the "mutual aid statute," *Vill. of Spring Green v. Deignan*, 2013 WI App 41, ¶ 10, 346 Wis. 2d 733, 828 N.W.2d 593—

> [a] peace officer outside of his or her territorial jurisdiction may arrest a person or provide aid or assistance anywhere in the state if…(1) [t]he officer is on duty and on official business; (2) [t]he officer is taking action that he or she would be authorized to take under the same circumstances in his or her territorial jurisdiction; and (3) [t]he officer is acting to respond to…[a]cts that the officer believes, on reasonable grounds, constitute a felony.

Case 2:15-cr-00083-JPS    Filed 06/07/16    Page 20 of 28    Document 167

Here, there is no question that Officer Huston and Officer Donaldson satisfied each of the criteria outlined in Wis. Stat. § 175.40(6)(a)(6)(a). As described above, the officers: (1) had reasonable suspicion that the occupants of the Suburban were involved in drug trafficking; and (2) had probable cause to believe that the driver was speeding. As possession with intent to distribute cocaine is a felony under both state and federal law, Milwaukee Police detectives were permitted by state law to arrest persons in the course of investigating that crime. *Id.* Though Mr. Cunningham argues that Wis. Stat. § 175.40(6)(a)(6)(a) does not authorize enforcement of traffic laws, his position is neither supported by case law nor the language of the Wisconsin state statute. *See e.g.*, *City of New Berlin v. Downey*, 2014 WI App 71, ¶ 8, 354 Wis. 2d 624, 848 N.W.2d 905 (concluding that an "officer had authority [to conduct a traffic stop] under Wis. Stat. § 175.40(6)(a) because he was (1) on duty, (2) taking action he would have been authorized to take in West Allis—*i.e.*, conduct a traffic stop of a vehicle driving into oncoming traffic, and (3) responding to an emergency that threatened life or bodily harm."). Thus, the Court finds that Officers Huston and Donaldson had proper authority to conduct the traffic stop in question.

4.      THE HOUSE SEARCH

On March 4, 2015, Agent Krueger submitted an affidavit for a warrant authorizing the search of Mr. Cunningham and Cheryl McArthur's home located at 3030 N. 38th Street in Milwaukee. (Docket #64, Ex. 2). The warrant permitted the officers to search the home for evidence of food stamp and wire fraud. (Docket #64, Ex. 1). Mr. Cunningham's second motion to suppress challenges the Magistrate Joseph's probable cause finding because the affidavit in support of the warrant failed to account for the Cunningham family's prior assets. (Docket #64). And, according to Mr. Cunningham, "[n]o

assumption about income can be made based on expenditure without knowing what other assets might be available to funds purchase." (Docket #158 at 18). Mr. Cunningham also argues that the warrant lacked particularity. (Docket #64).

Magistrate Duffin rejected both of Mr. Cunningham's arguments. (Docket #144 at 12-18). First, he ruled that probable cause supported the warrant. (Docket #144 at 12-14). Second, he found the warrant sufficiently particularized. (Docket #144 at 15-18). Finally, he concluded that, even if the warrant was not supported by probable cause and/or was not sufficiently particularized, the officers executing the warrant did so in good faith under *United States v. Leon*, 468 U.S. 897, 922 (1984).[5] (Docket #144 at 17-18).

A reviewing court will defer the probable cause determination to the judge who issues a warrant so long as the issuing judge had a substantial basis to conclude that a search of the places described therein would lead to evidence of criminal conduct. *United States v. Spry*, 190 F.3d 829, 835 (7 th Cir. 2009). Probable cause requires a finding that "under the totality of the circumstances…there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Navarro*, 90 F.3d 1245, 1252 (7th Cir. 1996) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). As such, there need not be an actual showing of criminal activity; probable cause merely requires "a probability or substantial chance of criminal activity." *Gates*, 462 U.S. at 243 n.13. The probable cause determination is a practical,

_____

[5]Mr. Cunningham did not challenge Magistrate Duffin's ruling with respect to the particularity issue. (Docket #144, #158). Thus, as the Court finds no independent basis from which to disagree with the magistrate's finding regarding the warrant's particularity, the Court adopts the reasoning and the ruling contained in the Report and Recommendation.

common sense inquiry that takes into account a totality of the circumstances known to the judge at the time information is presented to obtain a warrant. *Gates,* 462 U.S. at 238*; United States v. Markling,* 7 F.3d 1309, 1317 (7th Cir. 1993).

In light of the high costs of applying the exclusionary rule, evidence obtained as a result of a warrant that lacked probable cause may still be admitted if the police objectively, and in good faith, relied on a facially valid search warrant. *Leon*, 468 U.S. at 920; *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984). "The objective good faith standard is described as whether a reasonably well-trained officer would have known that the search was illegal despite the judge's authorization." *United States v. Adams*, 56 F.3d 737, 747 (7th Cir. 1995) (internal citations omitted). Without proof that the issuing judge abandoned his/her neutral role, "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objective reasonable belief in the existence of probable cause." *United States v. Sleet*, 54 F.3d 303, 307 (7th Cir. 1995) (internal citations omitted).

The Court agrees with and adopts the conclusion and reasoning set forth by Magistrate Duffin, namely that the affidavit submitted by Officer Krueger supplied probable cause to support the issuance of a search warrant. The affidavit explained that the investigation into the Cunninghams' alleged involvement with drug trafficking had occurred for approximately four years prior by means of wiretaps, traffic stops, and surveillance. (Docket #64, Ex. 2 at 2-14). Much of this investigation had linked the Cunninghams to drug trafficking in the Milwaukee and Chicago areas. (Docket #64, Ex. 2 at 2-14).

In addition, the affidavit lays out, in chart form, the difference between incomes and expenditures for Mr. Cunningham, Cheryl

Cunningham, Tamara McArthur, and Cierra McArthur. (Docket #64, Ex. 2 at 14-20). Within these charts— and contained in the numbered paragraphs that precede and follow them—the government details various high-value expenses made by members of the Cunningham family and compares these expenses to the Cunninghams' reported incomes on SNAP applications. (Docket #64, Ex. 2 at 14-20). Some examples of these high-value purchases included vehicles, vehicle rentals, jewelry, and homes. (Docket #64, Ex. 2 at 14-20). During the time in question, law enforcement had also seized lump sums of cash, $8,000.00 and $44,000.00, on two separate occasions from the Cunninghams. (Docket #64, Ex. 2 at 8-9).

Using the income and expenditure estimates, along with information derived from the government's investigation into the Cunningham family, Magistrate Joseph reasonably concluded that the Cunninghams were failing to accurate report all of their income in their food stamp benefits applications. And, because the totality of the circumstances revealed that "there [wa]s a fair probability that contraband or evidence of" food stamp and/or wire fraud "w[ould] be found in" the Cunningham's residence, the Court will defer to the magistrate's decision that probable cause supported the search warrant in this case. *Navarro*, 90 F.3d at 1252.

Mr. Cunningham argues that the income and expenditure charts appearing in the affidavit are fatally faulty because they do not take into account any assets that the Cunningham family might have owned prior to 2010. (Docket #158 at 19). Mr. Cunningham, however, circumscribes the probable cause inquiry too narrowly. Indeed, the government did not need prove that the Cunninghams were engaged in criminal conduct; rather, the government was required only to establish a *probability* of criminal activity. The estimates, despite their failure to cite to pre-existing assets, sufficed to

demonstrate a reasonable likelihood of discrepancy between what the Cunninghams were allegedly earning/reporting and what they were spending on non-essential living items.

Moreover, the Seventh Circuit has repeatedly defined the probable cause inquiry as one that is pragmatic and one that takes into account the totality of the circumstances. *Spry*, 190 F.3d at 835; *Navarro*, 90 F.3d at 1252; *Markling,* 7 F.3d at 1317. Not once has the Seventh Circuit adopted the teachings of *Holland v. Untied States*, 348 U.S. 121 (1954)—which dealt with a proper method of proof in a tax fraud case—within the context of a probable cause/warrant case. Indeed, the totality of the circumstances evaluation that the Seventh Circuit demands is antithetical to Mr. Cunningham's position, namely, that the government's failure to comply with the teachings of *Holland* is dispositive of probable cause in a money laundering case. The Court declines to advance such a wide reaching position here.

More to the point, the probable cause determination in this case is largely academic. As stated by Magistrate Duffin, suppression of evidence seized during the search of Mr. Cunningham's home is not appropriate as the officers who executed the warrant had probable cause to search and the officers relied in good faith on the facially valid warrant. *Leon*, 468 U.S. at 920. Thus, because the warrant authorizing the search of Mr. Cunningham's home was supported by probable cause and was executed in good faith, the Court will deny Mr. Cunningham's motion to suppress.

4.      MOTION FOR RETURN OF PROPERTY

Finally, Ms. McArthur asks this Court to return a cashier's check in the amount of $58,516.44 that was seized by the government on March 6, 2015, pursuant to a search warrant. (Docket #109). On May 5, 2015, a grand jury

indicted Ms. McArthur with federal money laundering charges; that indictment included a forfeiture provision that named the check as property subject to forfeiture under 21 U.S.C. § 853. (Docket #83). On July 21, 2015, this Court entered an order under 18 U.S.C. § 983(A)(3)(B)(ii)(II) that permitted the government to maintain custody of the cashier's check, pending resolution of this case. (Docket #54).

In her motion, Ms. McArthur claims that $38,616.44 of the cashier's check should be returned to her because it is not a forfeitable asset. (Docket #109). She asks for the return of this money so that she can retain the counsel of her choice. (Docket #109). In response, the government outlines various theories under which it would be able to recover the full dollar amount of the cashier's check. (Docket #113). Specifically, it argues that the entire amount of the check is forfeitable because the real property which was sold to generate the check was used to facilitate drug trafficking. (Docket #113) (citing 21 U.S.C. § 853(a)(2)). In addition, the government argues that the entire property is forfeitable as property "involved in money laundering." (Docket #113) (citing 18 U.S.C. § 982(a)(1)).

The Court agrees that, at this juncture of the litigation, and under the theories presented by the government, the prudent course of action in this case will be to deny Ms. McArthur's motion. (Docket #109). Ms. McArthur has failed to reply to the government's brief and, as such, the Court has no independent basis from which to conclude that either theory of full recovery presented by the government is inherently flawed. *See* 21 U.S.C. § 853(a)(2) or 18 U.S.C. § 982(a)(1). Thus, Ms. McArthur's motion will be denied. (Docket #109).

5.    CONCLUSION

In sum, the Court rejects Mr. Cunningham's objections that the traffic stop in question was not supported by probable cause and/or reasonable suspicion and that it was unreasonably delayed. In addition, the Court concludes that the officers who conducted the stop in question had proper authority to do so under Wis. Stat. § 176.40(6) and that the search of the Suburban was supported by probable cause. Pursuant to the plain view doctrine, the fruits of the government's search of the Suburban were properly seized.

Finally, the Court concludes that the officers who executed the search warrant on Mr. Cunningham's home did so: (1) on the basis of a search warrant supported by probable cause; and (2) in good faith reliance on a facially valid search warrant. Thus, the Court will adopt Magistrate Duffin's report and recommendation (Docket #144) and deny Mr. Cunningham's motions to suppress (Docket #64, #65).

The Court will also deny Ms. McArthur's motion for the return of property (Docket #109) as the government has set forth sufficient bases at this juncture in the proceedings upon which the cashier's check may be properly forfeited in its entirety.

Accordingly,

IT IS ORDERED that Magistrate Judge William E. Duffin's report and recommendation (Docket 144) be and the same is hereby ADOPTED; and

IT IS FURTHER ORDERED that, consistent with the Court's adoption of the magistrate's report and recommendation, Mr. Cunningham's motions to suppress (Docket #63, #64) be and the same are hereby DENIED; and

IT IS FURTHER ORDERED that Ms. McArthur's motion for the return of property (Docket #109) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 7th day of June, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge